[No. 37040.   Department One.   May 14, 1964.]

J. I. CASE CREDIT CORPORATION, *Respondent,* v. GEORGE F. STARK *et al., Appellants.**

*Miller, Jansen & Sackmann,* for appellants.

*McKevitt, Snyder & Thomas* and *Hart Snyder,* for respondent.

*Reported in 392 P. (2d) 215.

RUMMEL, J.†—The plaintiff, J. I. Case Credit Corporation, was granted a judgment by the superior court on its note and foreclosure of its chattel mortgage against the defendant mortgagors, George F. Stark and wife. The mortgage had been executed by Mr. Stark to secure the balance of the purchase price of a combine sold by the Lacrosse Hardware Company, which combine had been manufactured by the J. I. Case Company. The J. I. Case Credit Corporation will be referred to herein as "Credit," the J. I. Case Company as "Case," the defendants, appellants here, as "Stark," and the Lacrosse Hardware Company as "Hardware."

On January 20, 1958, Stark leased a Case Model 302 combine, described in the Case brochures as a self-propelled, side-leveling, hillside combine, from Hardware. The lease was on a Case printed form, and provided, among other terms, that the lessee, at his own expense, unless specifically covered by terms of the printed warranty regularly issued by Case, would make all repairs necessary to maintain the machine in good operating condition. A further provision granted the lessee an option to purchase the combine for $9,000 at any time prior to the end of the rental period, which was October 1, 1958, with the right to apply as part of such payment all rent paid thereon, together with the unexpended balance of any rental reserve deposited by lessee. Two used combines were deposited by the lessee as a rental reserve with authority to sell. The space provided in the lease for the amount of the rental was left blank.

Although the testimony indicated considerable trouble with the combine, consisting mainly with the leveling device, on September 29, 1958, the lessee exercised his option to purchase by signing a Case customer's order form with Hardware as the seller. This form stated a total price of $13,226.67, upon which an allowance of $4,226.67 was made for the two used combines, resulting in a balance due of $9,000. Apparently the parties disregarded the provision of

†Judge Rummel is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

the lease, the literal application of which would have allowed the proceeds of the sale of these combines to be deducted from the $9,000. The order form contained this clause in bold faced type:

"The undersigned hereby acknowledge receipt of a copy of this order, which together with warranty provision on the back hereof is understood to be the entire contract between us."

On the back appeared Case's standard warranty. The space provided for the dealer to accept the order was unsigned. Stark then signed a note and chattel mortgage on Case forms. The mortgage described the combine as "new." Credit purchased the note and mortgage.

Stark alleged failure of consideration, that the note and mortgage were executed and delivered on the promise that the combine would be repaired and placed in good operable condition and able to perform the work it was designed and warranted to perform, and that the combine was unmerchantable and dangerous to operate.

Credit contended the combine was sold without warranties, except as contained in the purchaser's order, and that Stark had used the combine in 1958, 1959 and 1960, and by payment of the first installment note in 1959, had waived any right of rescission.

On ex parte motion, Case was joined as a party, but the order was vacated upon motion of Credit. Stark's further motion to join Case and Hardware as the real parties in interest was denied.

The case was tried to the court with a jury sitting in an advisory capacity. The jury found, by special interrogatories, that the combine was not safe to operate, that it would not perform the work it was designed to perform, that the combine had been purchased and the note and mortgage signed upon the condition that the combine would be placed in a good operating condition, and that Stark had refused to purchase the machine until representatives of Case and Hardware had guaranteed him that it would be repaired and placed in the condition that it would be safe to use and would perform the work it was designed to do.

Notwithstanding the findings of the jury, the trial court granted a judgment of foreclosure. This was based on rulings that the agreement to repair was an inconsistent parol condition which could not be established to vary the terms of the purchase order, that any such promises were conditions subsequent to be performed in the future and therefore did not constitute fraud, and that, by using the combine during the 1959 and 1960 harvests, Stark waived any conditional delivery. From this adverse judgment, Stark appealed.

■ It seems to have been overlooked in this matter that Stark's right to purchase the combine was established by the option contained in the 1958 lease agreement. Although the amount of rental was not filled in on the form, had Stark not exercised the option and turned the machine back, he would have been liable for a reasonable rental for 1958. He turned in two used combines as security for this rental. By thus changing his position and by his liability for rent, he furnished consideration to support a vested right in the option to purchase. This option gave him a legal right to apply a rental, which could have been exacted, toward the purchase price of the combine.

Under the lease agreement, Stark's only duty toward repairs was in connection with those repairs not covered by Case's warranty. At the time Stark exercised his option, he had a legal right to purchase a combine which was free of any defects covered by the warranty. By the signing of the order form, Stark did nothing more than to exercise the right to purchase, which right he already possessed. Whether Case made any promises to perform the obligations it already owed under its warranty is immaterial. Inasmuch as the leveling device was defective from the beginning, any time limits in the warranty do not apply. The difficulties were of a continuing nature; they were never remedied.

There seems little doubt that the leveling mechanism on the combine did not work properly, and that Hardware, under its dealer agreement with Case, attempted to readjust or rebuild it, without permanent success. On each side of the combine was a gear-toothed vertical bar, known

as a rack, which was meshed with a small pinion gear. During the leveling operation, each pinion rotated on the rack, one down and the other up. Due to an inherent fault in the racks, when the pinions were set with proper clearance at the center of the racks and then moved toward the ends of the racks, the clearance was increased, resulting in the teeth on the pinion gears jumping the teeth on the racks. Thus, the relative position of one side of the leveling device with the other side was changed so as to cause the device to be thrown out of adjustment. Case furnished a brace for the right side to *force* the pinion tighter against the rack. There was no way to attach a brace on the left side. It hardly requires an engineer to recognize that such a defect cannot be corrected by forcing, and, in this instance, it was not corrected. Dorman, the salesman for Hardware, testified positively that the leveling device never did function properly and could not be made to do so.

As late as June of 1960, Babb, a mechanic for a Case dealer in another town (and a witness for Credit), went to the ranch at Stark's request to work on the combine. This witness testified that sometimes they got machines which were weak as to the leveling device, and that he had designed a brace to give the leveling device some stability, and, in his opinion, as they came from the factory, the rack and pinion were not a proper leveling device. He said further that there was no place on the left side of the machine to attach a brace.

Although Stark complained of some other defects, he testified that they were minor or were corrected, and that the leveling mechanism was the chief difficulty with the combine. Stark purchased the combine because it was designed to operate on side hills. According to Case, it was designed to operate on hillsides with grades up to 40 per cent. The testimony was undisputed that Stark needed a hillside type combine on his ranch. The failure of the leveling device was a substantial defect. Case warranted its machine "to be capable under ordinary conditions of doing the work for which it was designed." The machine failed to fulfill this warranty.

Credit's position is that it is a separate corporation, that any claim against Case cannot be used as a defense to this foreclosure, and that it is entitled to the immunities of a holder in due course without notice. The testimony of Case and Credit representatives revealed these facts: Credit is a wholly-owned subsidiary of Case; the secretary-treasurer of Case is president of Credit; all employees of Credit are paid by Case; the credit manager of Credit is also an employee of Case; both companies have the same address, the same lawyers, the same nonresident agent, and the same auditors; Credit is in business only to handle retail financing for Case.

■ The decisions in this state defining when the courts will "pierce the veil" to look through the corporate organization and determine identity of responsibility are not so clearly harmonious as to render the law easy of application. The purport of the cases is that all of the elements of sameness just noted are insufficient in themselves to enable a court to declare two corporations to be identical in responsibility, but there must be such a commingling of property rights or interests as to render it apparent that they are intended to function as one, and, further, to regard them as separate would aid the consummation of a fraud or wrong upon others. *Sommer v. Yakima Motor Coach Co.,* 174 Wash. 638, 26 P. (2d) 92 (1933); *Dummer v. Wheeler Osgood Sales Corp.,* 198 Wash. 381, 88 P. (2d) 453 (1939); and cases cited therein.

Horowitz, in a comprehensive article entitled "Disregarding the Entity of Private Corporations," 14 Wash. L. Rev. 285, 294, and 15 Wash. L. Rev. 1, concludes from his study of the cases as follows:

"While the facts of each case, in which the doctrine of disregarding the corporate entity is applied, vary, there is one situation common to all: a right owned and its corresponding duty owed to the person demanding recognition of his right and the performance of its corresponding duty. For example, the obligee of a contract has a right to receive performance of its obligations. The obligor, on the other hand, is under a corresponding duty to perform those obli-

gations. When the doctrine of disregard is applied, it is applied because of the necessity of enforcing this right-duty. . . . When expressed it has usually been expressed in a restricted form, namely, by a holding that before a corporate entity is disregarded, some species of fraud, bad faith or other wrong must exist to be obviated . . . But such cases often mean nothing more than that violation of duty (denoted as fraud) will result if the entity be not disregarded. . . . The enforcement of the duty owed requiring it, the courts disregarded the corporate entity by refusing to give effect to the claimed incident of corporate status." (p. 294)

A decision very similar to the instant case is *Advance-Rumely Thresher Co. v. Geyer,* 40 N. D. 18, 168 N. W. 731 (1918). This was an action to recover a claimed balance on a note and to foreclose a chattel mortgage given to secure it. The defense was that the note was given for the purchase price of certain plows and equipment, and that the plows were unfit for plowing, so that a breach of the seller's warranty existed. M. Rumely Company, an Indiana corporation, manufactured the equipment; Rumely Products Company, a New York corporation, was organized to sell it; the note and mortgage were transferred back to the M. Rumely Company, and the plaintiff, a New York corporation, came into possession of the note by taking over some of the M. Rumely Company's property when the latter became insolvent. Two payments of $100 had been made to the M. Rumely Company, but the defendant testified he would not have made these payments except for a promise to make the plows good. In passing upon the question of corporate entity, the North Dakota Supreme Court said, p. 25:

"It is not difficult to see, under such an arrangement as claimed by the plaintiff, that the public and the people who deal with concerns organized in the manner claimed for the M. Rumely Company and Rumely Products Company could have no recourse against them or either of them for breach of warranty of machinery purchased from such concern, or for any other cause of action, for the reason that M. Rumely Company would claim that it sold machinery outright to the Rumely Products Company, therefore was under

obligations to no one excepting the Rumely Products Company, while the Rumely Products Company, immediately upon taking good negotiable paper for the machinery, would immediately indorse it to the M. Rumely Company before maturity, and thus the M. Rumely Company would take shelter under the familiar rule of negotiable paper, that it took it in the ordinary course of business before maturity for value. Under such an arrangement, the public who deal with such concerns would be left helpless and would have no recourse for any cause of action against such concerns.

"The time has passed, or at least is swiftly passing, when courts are confined, in their analysis, to the mere form and entity of the corporation. Courts will look upon the corporation as a legal entity until sufficient reason arises to look beyond the mere form and entity of the corporation. If the corporation is so organized that it can be used to defeat the rights of innocent parties, defeat public convenience, or cut off the right of redress, or of action against it or against other corporations of which it is, in effect, an agent, a court of equity will look through the form of the corporation and examine the substance of it, and if several corporations are organized for a common purpose, it will look through the forms of all such corporations to the substance thereof; and the fact that several corporations are organized to carry out a common purpose will not prevent redress to an injured party, though the corporation which causes the injury or loss claims to have no connection with the general purpose for which the principal corporation is organized. Its legal entity will not alone protect it."

In holding, as to the rights of the defendant, that the corporate identities were to be ignored, the court also pointed out that the mere manufacture of the machinery did not terminate the object for which the M. Rumely Corporation was formed, but that the marketing process performed by the Rumely Products Company was equally as important a part of the business, and that the corporations were really in effect one company, though operated under separate names.

In denying to the plaintiff the rights of a holder in due course, the court further discussed the application of the warranties to the implements (warranties similar to those in the instant case) in this language, p. 28:

" . . . If a plow is made of good material, if it is properly constructed and built, if it is mechanically correct, it should do the work for which it was built and intended; and if it does not do the work for which it was constructed and intended, then, as a plow, it is of little value, and to the purchaser would be practically worthless. Presumably the reason the purchaser bought the plow and gave his note therefor was to get a plow that would do the work, and the testimony is quite conclusive that this plow would not do the work for which it was constructed. The plow in question was warranted to be made of good material and, with good care and proper use and management, to do as good work as other plows of like size and capacity made for the same purpose."

For the reason that Case owed a duty to Stark under its warranties, Credit cannot pose as a holder in due course and thus permit Case to escape its responsibilities. For the purpose of this suit, the corporate identities are one and the same. Although each of the items of identity may, in itself, be but a link in a chain to join the two corporations, the final connection is established by the duty owed. To hold otherwise would result in a wrong being perpetrated upon Stark.

Boyles, then territory supervisor for Case, assisted in closing the sale with Stark. He admits one trip to the Stark ranch with the salesman, Dorman, for this purpose. The order form was filled out by the salesman, while the note and mortgage forms were completed by Boyles. The latter testified that, after they left the farm, he asked Dorman if he would make sure Stark's complaints were taken care of. According to Dorman, Hardware worked on the machine up to about January 15, 1959, which work included an unsuccessful attempt to cure the defects in the leveling mechanism. In the face of this, Case can hardly complain about lack of notice. Parts of the combine were brought into Hardware's shop for repairs. Hardware requested Case to furnish new parts, or even take the combine back. Case failed to make good on its warranty.

Dorman went again to Stark's ranch to help him work on the machine during the harvest of 1959, although the salesman was then no longer connected with Hardware.

Stark made a $3,276.90 payment, due October 1, 1959, after the 1959 harvest. Mrs. Stark testified she wrote the check for this and accompanied it with a letter stating their dissatisfaction with the combine.

Stark was still attempting to make the machine work properly up to and including the 1960 harvest season. Babb, a mechanic working for a Case dealer, attempted repairs in June, 1960. Finally, claiming that he could use the combine for only part of the 1960 harvest season, and determining that it could not be repaired, Stark returned it to Hardware in the forepart of September of that year, but made no further payment on the note. Credit asserted that, by this delay, Stark waived any right to rescind, and the trial court so found.

██ In some of the prior cases, this court seems to have strictly applied such a rule. However, the case of *Lester v. Percy*, 58 Wn. (2d) 501, 364 P. (2d) 423 (1961), and cases cited therein, indicate a less harsh treatment of the buyer. In this case it was stated, p. 503:

"Respondent contends that the rule in this state is that one who seeks to rescind a contract upon the ground of breach of warranty must do so promptly upon discovery of the breach, otherwise the right to rescind is waived. We agree with respondent's statement of the general rule, but it is subject to certain exceptions, two of which are (1) the waiver must be voluntary and intentional, and (2) the right to rescind is not waived when the delay in claiming it is induced by the vendor."

In the *Lester* case, the buyer used a washer and one replacing it for approximately 9 months, and a dryer and one replacing it for about 6 months. This use was in a nursing home requiring 10 or 12 washings a day.

In the instant case, after the purchase, Stark used the machine for the harvest season of 1959, and part of 1960, consisting of about 2 months or less of total operation. Under the circumstances, this did not constitute more than a reasonable time to ascertain if the machine could be made to function properly. The purchaser here exhibited no more than an attempt in good faith to make the equipment work.

Such conduct seems to have been expected when Case stated as part of its warranty:

"If the product is found by the Company to be defective in material or workmanship, then the Company will see to it that the defect is remedied . . . and *in any event purchaser agrees to render necessary and friendly assistance without compensation.*" (Italics ours.)

Too often purchasers find themselves on the horns of a dilemma—if they act promptly in returning the goods, they are accused of not allowing sufficient time to test them; if they take adequate time, the seller claims a waiver.

Stark is entitled to a rescission.

The similar case of *McCaw v. Advance-Rumely Thresher Co.,* 158 Wash. 533, 291 Pac. 319 (1930), is distinguishable on the basis that there the court found no notice of a rescission nor any attempt to return the machines prior to suit.

■ The general principle is that one who secures rescission must restore the other party to as near his former position as possible. In this instance, Stark should be entitled to receive back what he has paid, subject to an adjustment, whether more or less than such payment, for the reasonable rental value of the combine for the service performed by it in 1958, 1959 and 1960. *Gooden v. Hunter,* 56 Wn. (2d) 617, 355 P. (2d) 20 (1960); *Rummer v. Throop,* 38 Wn. (2d) 624, 231 P. (2d) 313 (1951); *Hopper v. Williams,* 27 Wn. (2d) 579, 179 P. (2d) 283 (1947).

The case is remanded to the trial court with directions to join Case and Hardware. If the two used combines are unsold, they will be returned to Stark, but if Hardware has sold them, the court will determine the net proceeds thereof which will be credited to Stark, and the note and mortgage will be cancelled. Judgment for the amount paid by Stark will be a charge against both Case and Credit because they are one, and Case is bound by the trial heretofore held. Judgment will be entered for or against Stark depending upon the determination of rental and the allowance to him of his costs on appeal. Case, Credit and

Hardware, if they wish, may continue in this action to litigate such of their differences as may arise from this determination.

OTT, C. J., HILL, HUNTER, and HALE, JJ., concur.

July 31, 1964. Petition for rehearing denied.