[Civ. No. 22590.   First Dist., Div. Three.   Feb. 2, 1966.]

LINCO SERVICES, INC., Plaintiff and Respondent, v. MICHAEL H. DuPONT, Defendant and Appellant.

Hill, Farrer & Burrill, Stanley E. Tobin, Jack R. White, and Albert J. Day, for Defendant and Appellant.

Sheldon D. Durham for Plaintiff and Respondent.

DRAPER, P. J.—Plaintiff sold an airplane to Harper Aviation Sales, Inc., and received in part payment note of that corporation for $25,000. The note was not paid, and plaintiff brought this action against the corporation. Also joined as defendants, on the *alter ego* theory, were H. S. Harper and appellant DuPont. After trial without jury, judgment went against all defendants for principal, interest, and attorneys' fees. Only DuPont appeals.

Defendant corporation was organized in 1957. It has not issued or applied for a permit to issue any stock. It was franchised to sell airplanes of one manufacturer. In 1958 the corporation had a net loss of $3,500, and in 1959 lost $41,000. In early 1960, its liabilities exceeded its assets. The corporation licensed its sales franchise to another, and ceased active business operations. It owed $40,000 to Cal-West Aviation Co., a corporation of which Harper was president. Harper also was president of Far West Airlines, a corporation which also owed Cal-West $40,000. Harper wanted to resume operation of defendant corporation, and to activate Far West. After some period of negotiation, on November 22, 1960, he and appellant DuPont executed a written agreement reciting their desire to ''become joint promoters'' of both corporations. The agreement stated that no stock of either corporation had been issued. It provided that 26 percent of the voting stock of each should be issued to DuPont and a like proportion to Harper, and that DuPont ''shall loan to Far West . . . the sum of $40,000'' and to defendant corporation a like amount.

Although DuPont made no loan to defendant corporation, he did guarantee its $40,000 debt to Cal-West, and advanced $30,000 to Far West. Meetings of directors of defendant corporation were most informal, but testimony of Harper (contradicted by DuPont) is that DuPont was elected vice president and a director in December 1960, and thereafter

participated in a number of directors' meetings. In March 1961, defendant corporation entered into a ''flooring agreement'' for loans from a bank under continuing guaranties signed by DuPont and his wife and by Mr. and Mrs. Harper, and went back into the business of dealing in airplanes. On April 11, 1961, the corporation purchased plaintiff's airplane for $40,000, $15,000 of which was paid and the balance represented by the promissory note here sued upon. Some $28,000 was advanced by the bank to defendant corporation on this plane under the flooring agreement. By early May, the bank had made like loans upon nine other planes. DuPont asked the bank to repossess the floored planes, and it did so. Defendant corporation was left with substantial debts but no assets save office furniture. On May 22, DuPont sent to defendant corporation a document refusing to accept appointment as a director or officer, and, if he were presently such, resigning the office. His testimony concedes that at this time ''I had, yes, ah, I had a feeling that probably'' defendant corporation was ''on the rocks''. There is testimony (denied by DuPont) that defendant corporation loaned $3,000 to a corporation operated by DuPont, and made the payment by check issued to DuPont.

██ The court found defendant corporation to be the *alter ego* of DuPont and Harper, and thus held them personally liable for the debt to plaintiff. DuPont argues that his agreement of November 22, 1960, cannot be relied upon, because it relates only to the future. He overlooks the testimony that he did in fact become an officer and director, participating in a number of meetings. This testimony was contradicted, but was accepted by the court. With the conceded fact that DuPont guaranteed the $40,000 indebtedness of defendant corporation to Cal-West, and also advanced $30,000 to the companion company as required by the same agreement, the court was fully justified in concluding that the agreement was in fact being performed.

DuPont testified to an understanding with Harper that the agreement was to become effective only when DuPont received funds from sale of a moving picture. But Harper denied any such understanding, and the court obviously accepted Harper's view.

Exercising its unquestioned right to weigh the evidence, the trial court was justified in determining that: DuPont, by his written agreement, active participation and guaranty to the bank, clothed defendant with the indicia of financial

stability; he thus secured its reentry into active business after its months of dormancy caused by financial weakness; he entered upon active participation in its affairs as a director and officer; this participation was such as to lead him to "resign" when the financial house toppled; as such participant, he shared responsibility for failure to issue any stock; he received benefit from his participation; he contributed to the financial inadequacy and the ultimate failure of the corporation by refusing to advance the agreed $40,000.

This evidence supports the court's finding of the two essentials to disregard of the corporate entity: (1) such unity of interest and ownership that the separate personalities no longer exist, and (2) the working of an inequitable result by treating the acts as those of the corporation alone (*Automotriz etc. De California* v. *Resnick*, 47 Cal.2d 792, 796 [306 P.2d 1, 63 A.L.R.2d 1042]).

As to (1), DuPont argues that it is not enough that the corporation be the mere instrumentality or adjunct of himself and Harper, and that there is a failure of proof that corporation and individuals were the " 'business conduits or *alter egos* of one another' " (*Erkenbrecher* v. *Grant*, 187 Cal. 7, 11 [200 P. 641]). On the facts here, this is an overly literal application of the language of that decision, and is not supported by the later cases (*Automotriz etc. De California* v. *Resnick, supra*; *Riddle* v. *Leuschner*, 51 Cal.2d 574 [335 P.2d 107]; *Stark* v. *Coker*, 20 Cal.2d 839 [129 P.2d 390]; *Claremont Press Pub. Co.* v. *Barksdale*, 187 Cal.App.2d 813 [10 Cal.Rptr. 214]; *Geisenhoff* v. *Mabrey*, 58 Cal.App.2d 481 [137 P.2d 36]).

The second requirement turns on "an inequitable result" and not on actual fraud (*Claremont Press Pub. Co.* v. *Barksdale, supra*, 187 Cal.App.2d 813, 817). Thus the absence of direct misrepresentation to plaintiff, and plaintiff's lack of knowledge of DuPont's participation, are not decisive. DuPont's participation did enable defendant corporation to return to active business, without capital stock and with inadequate financing. This resumption, in turn, invited the public generally to deal with the unsound corporation, and plaintiff did so to its loss. We cannot hold unsupported the trial court's conclusion that in these circumstances strict recognition of the separate corporate entity would work an injustice.

As is generally true in the hindsight of detailed appellate review, we can find some technical inadequacies in the find-

ings. But we deem the findings sufficient to support the conclusions and the judgment.

Judgment affirmed.

Salsman, J., and Devine, J., concurred.

A petition for a rehearing was denied March 4, 1966, and appellant's petition for a hearing by the Supreme Court was denied March 30, 1966.