[No. 2056-1.    Division One.    July 29, 1974.]

SODERBERG ADVERTISING, INC., *Respondent,* v. KENT-MOORE CORPORATION, *Appellant.*

*Graham, McCord, Dunn, Moen, Johnston & Rosenquist* and *Bruce M. Pym,* for appellant.

*Langlie & Praeger* and *Arthur S. Langlie,* for respondent.

HOROWITZ, J.—Defendant Kent-Moore Corporation appeals a judgment holding it liable to plaintiff Soderberg Advertising, Inc., for an unpaid debt of Peter Kennedy, Incorporated. The judgment was reached by applying the doctrine of disregarding the corporate entity of the ostensible debtor.

The facts and the findings of fact are largely undisputed. They may be summarized as follows. Prior to early 1970, Peter Kennedy, Incorporated (PK) was engaged in the manufacture of ski poles and related product lines. PK was a well-known name in the industry. Its financial position, however, had so deteriorated that continued business operations were unlikely. Accounts receivable were excessive, collections were poor, and additional bank financing was unavailable.

About June 1970, Kent-Moore Corporation (KM), a large, financially successful corporation, contacted PK with a view to purchasing the company. It fairly appears that KM believed that PK products had "exciting" potential. Following negotiations conducted on behalf of KM by its representative John D. Adair, Jr., KM took a purchase option, exercisable by June 1, 1971, on all of the outstanding PK stock. PK and KM agreed that, pending the exercise of

the option, they would enter into certain written agreements the effect of which would insure KM's absolute control over PK's affairs. Accordingly, on August 20, 1970, the parties executed an option agreement, voting trust agreement, loan agreement, employment agreement, and an agreement not to compete. The loan agreement obligated KM to lend PK at least $50,000, with a right in KM in its sole discretion to lend additional funds. All loans were to be secured by virtually all of PK's assets then and thereafter to be acquired. KM also agreed to provide PK with management assistance.

The trustees named in the voting trust agreement were all KM employees. Shortly after August 20, 1970, the voting trustees elected a seven-member board of directors for PK. Five of the members were KM personnel; two were PK personnel. The five KM members included J. Douglas Adair, president of KM, Richard Strickland, a KM group vice-president, and John D. Adair, Jr., of KM, son of the president of KM. The board conducted its business by consents as provided by RCW 23A.08.345.

The board then elected John D. Adair, Jr., president and treasurer, Richard Strickland vice-president, and Peter J. Monaghan secretary. These officers had been or were connected with KM. The board also elected attorney Alan F. Austin assistant secretary. He had previously represented PK management and continued to represent some PK stockholders. He resigned, however, on October 7, 1970, and, on October 21, 1970, was succeeded by Bruce M. Pym, then and now an attorney for KM.

John D. Adair, Jr., as president and treasurer, became chief executive officer of PK, and J. D. Streidl became PK's controller. KM paid the salaries of both men, and many of John D. Adair, Jr.'s expenses were paid directly by KM. Richard Strickland, although not engaged in the day-to-day operational activities of PK, had the responsibility for supervising KM's investment in and loans to PK. Pursuant to this responsibility, Mr. Strickland frequently communicated with John D. Adair, Jr., while the latter was presi-

dent and treasurer of PK, and from August 11, 1970, through April 29, 1971, visited Seattle on various occasions. The new management of PK made some restructuring of personnel duties. Michael E. (Peter) Kennedy III, former president of PK, became sales representative and special consultant.

In August and September 1970, PK sent letters to its dealers informing them of KM's financial and managerial support. This was done to give the dealers some assurance about PK and to convince them to continue as PK dealers. Copies of the then latest KM financial report were given to individuals unfamiliar with KM and expressing an interest in having it.

In October 1970, PK determined it wanted to obtain a new advertising agency. PK contacted plaintiff for that purpose. A series of meetings were thereafter held. Following the meetings, plaintiff was appointed PK's new advertising agency. The court entered the following finding of fact with respect to the facts leading up to the new appointment:

> John D. Adair, Jr. first met with plaintiff in early October of 1970 and informed plaintiff, among other things, that he was the president of PK, had recently come from KM, was related to the senior management of KM, that KM was providing funds and management to PK, that KM had an option to purchase PK, that it was necessary to actively promote the products of PK and make it a success so that KM would ultimately purchase PK. Plaintiff was given the impression that the resources and the money of KM were available to back PK, and plaintiff reasonably believed that if it provided promotional and advertising services to PK funds would be available from KM for the full payment of plaintiff's services. Plaintiff relied on the statements and actions of John D. Adair, Jr. and the presence of Richard Strickland, a vice president of KM who was introduced as such to plaintiff.

Finding of fact No. 7. *See* finding of fact No. 15; Pretrial Stipulation B ¶ 20.

The court further found in unchallenged finding of fact No. 12:

Plaintiff provided advertising and promotional services to PK at the request of John D. Adair, Jr., relying on the apparent financial support and management control of PK by KM. At the meeting of October 5, 1970, plaintiff was advised by John D. Adair, Jr. that KM had acquired an option to purchase the stock of PK and, as part of the transaction, had agreed to provide PK with funds and management. Mr. Adair at that time indicated that he was president of PK. He further indicated that he was vitally concerned that PK be changed into a viable economic entity, that there was only a short time in which this could be accomplished because KM had only a limited opportunity in which to observe PK's progress before deciding whether to exercise its option, and that it thus was very important that PK's advertising agency be willing to exert every effort on behalf of PK even though it might not result in great immediate financial benefit to it.

Following plaintiff's appointment,

plaintiff served as the advertising agency for PK and provided various advertising and promotional services including the preparation of magazine inserts, decals, business cards, dealer instruction brochures, trade show exhibits and other services. The value of those services was not disputed at the time of trial and is in the total sum of $28,695.21. Plaintiff is unpaid for those services.

Finding of fact No. 8. One of plaintiff's responsibilities was to prepare a 1971 PK catalog. Plaintiff did so. The back page of that catalog contains the following statement concerning KM's relationship to PK in the form finally approved by KM's president:

Kent-Moore Corporation . . . your new partner.

Unlike Peter Kennedy, Inc., Kent-Moore Corporation needs an introduction to the ski industry. Prior to our new association with Peter Kennedy, we had never been involved in consumer sales . . . much less with ski equipment.

Our corporate family has grown impressively over the

years through internal expansion, the launching of new ventures, as well as acquisitions. As we have become involved in new endeavors, we have been careful to associate ourselves only with those who are leaders in their respective fields. Often their individual growth has been stifled by lack of investment capital and complex administrative problems. Kent-Moore is a highly diversified organization consisting of ten divisions and subsidiaries around the world. Products range from aircraft parts to component parts for farm tractors. The commonality of Kent-Moore's and Peter Kennedy's interest is best expressed by the KMC corporate responsibility to its customers: To produce a superior product at an equitable price, and to stand behind that product.

By combining the special expertise and product technology of PK with our own company's resources, we can provide you, our valued dealer, with an impressive line of quality ski equipment and an exceptional opportunity for profits. Together—you, KMC and PK—we are all partners with the common goal of sales success with skiers everywhere.

/s/ J. D. Adair
J. D. ADAIR
President
Kent-Moore Corporation

The court also found:

From and after August 20, 1970, KM, acting by and through John D. Adair, Jr., J. D. Streidl, Richard Strickland, and J. Douglas Adair, exercised the full management and control of PK and directed its affairs in their entirety. Such control was continuous until April 28, 1971 . . .

Finding of fact No. 6.

Between July 14, 1970, and April 28, 1971, notwithstanding KM's agreement to lend PK only $50,000, KM actually lent PK a total of $483,185.22. The loan proceeds enabled PK to satisfy $174,217 of its indebtedness owed the Bank of California, NA, and to pay PK's unsecured creditors over $72,000, representing 40 percent of PK's debts when KM acquired the option. Over a 4-month period from November 11, 1970, to February 9, 1971, certain billings of plaintiff to

PK for services rendered were paid. Meanwhile, PK's account with the Bank of California, NA

> was kept at a near zero balance to avoid garnishment or interference from creditors, and funds were transferred from KM to the PK account pursuant to a "wire transfer" initiated from the KM headquarters at Warren, Michigan. Such transfers were requested from time to time by John D. Adair, Jr. or J. D. Streidl in order to cover overdrafts issued by them on the PK account with The Bank of California.

Finding of fact No. 11.

On the matter of the relationship between PK and PK personnel with respect to KM, the court made the following unchallenged finding:

> John D. Adair, Jr., while he was president of PK, acted for and on behalf of KM, and both orally and in writing guaranteed on behalf of KM certain purchases from suppliers of PK. Mr. Adair had authority to act as the president and chief executive officer of PK, and also had authority to act so as to bind KM under some circumstances. Mr. Adair conducted frequent telephone coversations with KM management in Warren, Michigan, and consistently sought the advice of such management. Mr. Adair was under control of the KM management through Richard Strickland, a group vice president of KM. KM at all times considered Mr. Adair, Jr. as a manager for KM of the PK operation. Mr. Adair, Jr. and KM represented to dealers and suppliers that KM had management control of PK and was providing funding to PK. There was domination and control at all times by KM of the PK entity. Books of account and other corporate records were separately maintained by PK and by KM.

Finding of fact No. 11.

On April 28, 1971, KM abandoned its option. Thereupon KM "gathered up the inventory and most of the personal property assets of PK pursuant to its security agreement and thereafter proceeded to sell and dispose of said inventory and assets." Finding of fact No. 6. On April 28, 1971, all officers and directors, other than Michael E. (Peter) Kennedy III and Alan F. Austin, resigned. KM made payments of about $1,000 on June 7, 1971, and October 15, 1971,

to the State of Washington to satisfy any liens the State might have or claim on PK assets by reason of unpaid PK unemployment contributions.

PK could not pay for plaintiff's services. KM refused to do so. Plaintiff then sued KM and PK to obtain judgment for its unpaid services. The complaint alleged that at the special instance and request of KM by its agents, officers and employees, plaintiff was requested to act as the advertising agency to PK and that the agents, officers and employees of KM assured plaintiff of compensation for its services as said advertising agency. It further alleged that plaintiff performed the services for which it sought judgment. The court held in part that PK had no separate existence of its own apart from KM; that it was a mere instrumentality and adjunct of KM so that PK's separate corporate existence should be disregarded "in order to defeat a wrong or injustice to plaintiff, and to prevent KM from avoiding its just responsibilities." Conclusion of law No. 6. From a judgment entered in favor of plaintiff against KM, the latter appeals.

KM makes various assignments of error in support of its basic contention that it is not liable to plaintiff. The assignments are argued together. It contends the doctrine of disregarding the corporate entity on which the court relied below in the conclusions of law it entered[1] is inapplicable;

---

[1]"3. During the period August 20, 1970, through April 28, 1971, KM so dominated and controlled PK and exercised such absolute authority in the direction and management of PK that PK had no separate existence of its own apart from KM, and accordingly the corporate entity of PK should be disregarded and the obligation of PK owing to plaintiff should be imposed upon and paid by KM.

". . .

"5. All the documents executed on August 20, 1970, and thereafter by and between KM and PK and Michael E. Kennedy III, gave KM an option to purchase PK, and provided KM the absolute right to manage and operate PK through May 31, 1971, if it so desired, without the interference of any of the original shareholders or the former directors, officers or managers of PK.

"6. The property rights and interests of KM and PK during the period August 20, 1970, through April 28, 1971, were so commingled and the corporation known as PK was so controlled and its affairs were

that plaintiff contracted with PK alone and took its chances on receiving full payment; that PK and KM at all times, as plaintiff knew or should have known, were intended to and did function as separate entities in arm's length transactions; that PK was not an instrumentality, agency, conduit or adjunct of KM; that to regard PK and KM as separate entities "does not aid in the consummation of a fraud or other wrong upon Plaintiff." Pretrial Stipulation D ¶ 22, at 125. These arguments raise questions of fact, as well as questions of law. *See* 1 W. Fletcher, *Private Corporations* § 43, at 210 (perm. rev. ed. 1963).

■ The only finding of fact which KM assigns as error is the following portion of finding of fact No. 7:

Plaintiff was given the impression that the resources and the money of KM were available to back PK, and plaintiff reasonably believed that if it provided promotional and advertising services to PK funds would be available from KM for the full payment of plaintiff's services. Plaintiff relied on the statements and actions of John D. Adair, Jr. and the presence of Richard Strickland, a vice president of KM who was introduced as such to plaintiff.

If the unchallenged findings, evidence and reasonable inferences therefrom support the challenged finding, we are bound thereby. We cannot constitutionally substitute our findings for those of the trial court. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

We are satisfied substantial evidence supports the challenged finding. Other unchallenged findings, including findings of fact Nos. 6, 11 and 12, provide additional support for the challenged finding. The court could find from the testimony of witnesses reviewed in plaintiff's brief on appeal, particularly that of plaintiff's president, P. Stanley Soder-

so conducted as to make it merely an instrumentality, agency, conduit and adjunct of KM so that the separate corporate existence of PK should be disregarded in order to defeat a wrong or injustice to plaintiff, and to prevent KM from avoiding its just responsibilities.

"7. Plaintiff is entitled to judgment against Kent-Moore Corporation, a Delaware corporation, in the amount of $28,695.21, together with its costs hereinafter to be taxed."

berg, that "plaintiff reasonably believed that if it provided promotional and advertising services to PK funds would be available from KM for the full payment of plaintiff's services." The court could base the challenged portion of finding of fact No. 7 upon that testimony. It fairly appears from the record that plaintiff would not have undertaken to furnish substantial advertising services on a continuing basis unless plaintiff believed it would be paid in full by PK and KM, PK's "new partner." This belief is based upon the statements and actions of KM's personnel. Findings of fact Nos. 6, 7, 11, 12.

The trial court described KM's dominance over PK, its purpose and legal significance as follows:

> I feel the Plaintiff must show the Plaintiff was misled to believing the resources of Kent-Moore would be available to pay their billings or induced to rely that Kent-Moore would pay their billings, or establish that Kent-Moore dominated and controlled the Peter Kennedy Corporation. . . . After hearing the testimony it seems to me the key or crux of this case is Kent-Moore was attempting to avoid any direct responsibility for the Peter Kennedy debts incurred during operations under the stock option and voting Trust, except to the extent of any loans made to Peter Kennedy. It appears to me that this initially is a legitimate business purpose. However, after taking over the operation it was necessary if not essential to continue Peter Kennedy in operation to give credibility in the form of financial responsibility. Essentially to show that Peter Kennedy would in some manner be able to pay debts incurred in its continuing operation. Certainly, Plaintiff's rights must be determined as to reliance or inducement on the facts as known to them. However, as to control or domination I do not feel it is necessary that the facts be known to Plaintiff at the time the obligation is incurred.

He further stated:

> Under the testimony and the facts as I find them to be, I feel the corporate entity of Peter Kennedy should be disregarded as to the obligation of Plaintiff to impose liability on Kent-Moore Corporation in the amount reflected in Exhibits 36 and 37. I consider the following

factor significant in reaching this conclusion. I feel that the Plaintiff knew as indicated in Exhibit 20 that Kent-Moore was providing management and funds to Peter Kennedy on a loan basis. I feel that during the course of conversation Plaintiff was given the impression that the resources and the money of Kent-Moore was available to back Peter Kennedy. I feel that this is indicated some way by the statement contained in . . . Exhibit 20. This was sent out with the acquiescence and knowledge of Kent-Moore. And although not shown that it was known to the Plaintiff, I feel it would be consistent to consider Exhibit 8 as going out to dealers to give the same indication to them that all of the management and control of Peter Kennedy during the period of time which we are concerned with was in John Adair, Jr., who was in effect paid during this time by Kent-Moore as to both his salary and expenses. . . . Since John Adair and [Jock] Streidl were the only persons who could sign checks over $500 I feel that the testimony establishes that the primary obligation and loyalty of both John Adair and Jock Streidl were to Kent-Moore. Essentially, all of the financing of Peter Kennedy in the period of time was made by Kent-Moore due to the procedure set up with the Bank of California. Essentially, the Peter Kennedy account was kept at a zero balance to avoid garnishment or interference from the creditors; and funds were transferred from the Kent-Moore account to the Peter Kennedy account to pay checks initially drawn in an over-draft situation. All of the Peter Kennedy property was pledged to Kent-Moore to secure the loan advances made. There was a substantial similarity of the board of directors of the two companies. And I feel in fact that there was domination and control by Kent-Moore of the Peter Kennedy entity.

The court had a right to conclude from the evidence that plaintiff believed KM would not so arrange matters that plaintiff would be inveigled into performing substantial and essential advertising services, highly beneficial to KM's own interests, without plaintiff being paid therefor. The court had power to enter the portion of finding of fact No. 7 challenged by KM.

It remains to consider whether the challenged conclusions of law, particularly Nos. 3, 6 or 7 favorable to plain-

tiff, are supported under the facts found. We hold they are.

■ Normally a corporate entity will be regarded unless so to do would help accomplish the breach of duty owing to the person who has dealt with the corporation. In exceptional cases, however, when the natural or artificial person sought to be held has so conducted himself or itself with respect to the person seeking relief that not to enforce the remedy for breach against that person would aid in the perpetration of a wrong as, for example, accomplishing a fraud, the corporate entity will be disregarded to prevent such a result. See J.I. Case Credit Corp. v. Stark, 64 Wn.2d 470, 392 P.2d 215 (1964); Harrison v. Puga, 4 Wn. App. 52, 62-63, 480 P.2d 247, 46 A.L.R.3d 415 (1971); 1 F. O'Neal, Close Corporations § 1.09a (1971); 1 W. Fletcher, Private Corporations §§ 41, 41.1, 41.2, 41.3, 44, 45 (perm. ed. rev. 1963).

The doctrine discussed should be distinguished from the doctrine of agency, actual or apparent, or estoppel, equitable or promissory. If the facts permit the application of any of these doctrines, any one of them alone may be used to impose liability against the actual or apparent principal, or against the person whose conduct creates the estoppel. Agency and equitable or promissory estoppel principles, of course, are well understood. See Gorge Lumber Co. v. Brazier Lumber Co., 6 Wn. App. 327, 493 P.2d 782 (1972); Williams Fruit Co. v. Hanover Ins. Co., 3 Wn. App. 276, 474 P.2d 577 (1970); Hellbaum v. Burwell & Morford, 1 Wn. App. 694, 463 P.2d 225 (1969).

KM contends plaintiff did not justifiably rely on KM paying its bills because plaintiff did not ask to examine the documents executed on August 20, 1970, and thereby ascertain that the relationship between KM and PK, as shown by such documents, was strictly contractual. Plaintiff, however, relies on what was said to him by persons who were part of KM's personnel. They led plaintiff to believe that it would be paid for its substantial services because of KM's continuing financial support. To permit KM to repudiate what finding of fact No. 7 described as "the impression that

the resources and the money of KM were available to back PK" and that "funds would be available from KM for the full payment of plaintiff's services" by upholding KM's present position that its security rights are paramount regardless of any such impression given, would be unconscionable.

KM contends the doctrine of disregarding the corporate entity is or should be confined to shareholders and not extended to one who holds an option to purchase all the shares of a corporation. It is true the doctrine of disregard is often applied in parent-subsidiary corporation cases to impose liability upon a shareholder for the debts of his corporation. F. Powell, *Parent and Subsidiary Corporations* §§ 3-20 (1931). However, for all practical purposes, the optionee KM had all the powers of a shareholder and much more. KM possessed and exercised life and death power over PK through its fiscal control. It had and exercised the power to appoint and control the personnel of the board of directors of which KM's president was a member. It caused KM personnel to be elected or appointed to the position of president and treasurer, and controller. It even paid their compensation. By this control, as the court pointed out, "the primary obligation and loyalty of both John Adair and Jock Streidl were to Kent-Moore." Facts of each case vary. The facts here, however, show KM in effect manipulated PK for KM's benefit by means of what has been characterized as "undue control" or "undue domination." *Finley v. Union Joint Stock Land Bank*, 281 Mich. 214, 274 N.W. 768 (1937); *Gledhill v. Fisher & Co.*, 272 Mich. 353, 262 N.W. 371, 102 A.L.R. 1042 (1935). The court could conclude from the evidence here and reasonable inferences therefrom that KM used its undue domination and control, through KM personnel with a primary loyalty to KM, to obtain and then avoid payment for essential services from which KM expected to receive great benefit. The domination was so complete that "the controlled corporation [had], so to speak, no separate mind, will or existence of its own and [was] but a

business conduit for its principal." 1 W. Fletcher, *Private Corporations* § 43, at 205 (perm. ed. rev. 1963).

In *Seattle Ass'n of Credit Men v. Daniels,* 15 Wn.2d 393, 396, 130 P.2d 892 (1942), the court in discussing the doctrine of disregard quoted the following with approval from *Pittsburgh Reflector Co. v. Dwyer & Rhodes Co.,* 173 Wash. 552, 555, 23 P.2d 1114 (1933):

> "In order to justify the judicial disregard of corporate identities, one, at least, of two things must clearly appear. Either the dominant corporation must control and use the other as a mere tool or instrument in carrying out its own plans and purposes so that justice requires that it be held liable for the results, or there must be such a confusion of identities and acts as to work a fraud upon third persons."

Even if both things must be shown as suggested in *Sommer v. Yakima Motor Coach Co.,* 174 Wash. 638, 26 P.2d 92 (1933) (decided prior to *Seattle Ass'n of Credit Men v. Daniels, supra*), the court could and did conclude from the evidence that both things had been proved. Footnote 1, *supra. See J.I. Case Credit Corp. v. Stark, supra* at 475. *See also Forest Hill Corp. v. Latter & Blum, Inc.,* 249 Ala. 23, 29 So. 2d 298 (1947); *Linco Servs., Inc. v. DuPont,* 239 Cal. App. 2d 841, 49 Cal. Rptr. 196 (1966); *Dillard & Coffin Co. v. Richmond Cotton Oil Co.,* 140 Tenn. 290, 204 S.W. 758 (1918). KM in good conscience can scarcely complain if the trial court determined that to recognize the separate entity of PK under the peculiar circumstances here would in effect place the court in the untenable position of assisting in the accomplishment of a breach of duty owing to plaintiff.

■ KM complains the court erred in admitting evidence of similar acts, circumstances or occurrences involving KM, PK and other persons which, at the time KM abandoned its option, were unknown to plaintiff. The specific evidence referred to comes from three witnesses. The testimony relates principally to representations by John D. Adair, Jr., to suppliers and dealers of PK concerning KM's relationship to PK. The court admitted the evidence as rele-

vant on the issue of the existence and intentional character of control and domination. We find no error.

In determining what evidence is relevant, the court has a wide discretion reviewable only for abuse. *Jacobs v. Brock*, 73 Wn.2d 234, 437 P.2d 920 (1968); *Coleman v. Dennis*, 1 Wn. App. 299, 461 P.2d 552 (1969). We find neither abuse of discretion nor prejudice. KM does not challenge finding of fact No. 6, *supra,* that KM exercised "the full management and control of PK and directed its affairs in their entirety. Such control was continuous until April 28, 1971 . . ." Evidence of similar acts, whether or not known to the person affected thereby, is admissible to show motive, intent, absence of accident, mistaken identity, or a common scheme or plan. *See Calbom v. Knudtzon*, 65 Wn.2d 157, 396 P.2d 148 (1964); *State v. Goebel*, 40 Wn.2d 18, 240 P.2d 251 (1952). As *State v. Goebel* points out, the admissibility of such evidence is not limited to the purposes stated. Admissibility depends on relevance to prove an issue in the case. The court had a right to determine the challenged testimony was relevant both on the issue of control and its intentional character.

Thus far we have not considered whether the findings of fact permit the judgment to be upheld on agency and estoppel principles independent of the doctrine of disregarding the corporate entity. The court's findings, in light of the court's oral opinion, would permit the judgment to be so upheld. *See* findings of fact Nos. 6, 7, 11, 12, *supra.* Finding of fact No. 11 states:

> KM at all times considered Mr. Adair, Jr. as a manager for KM of the PK operation. Mr. Adair, Jr. and KM represented to dealers and suppliers that KM had management control of PK and was providing funding to PK.

It is further stated:

> Mr. Adair had authority to act as the president and chief executive officer of PK, and also had authority to act so as to bind KM under some circumstances. . . . Mr. Adair was under control of the KM management . . .

Finding of fact No. 6 points out that KM controlled PK.

This control was accomplished by KM personnel of its own choice, the salary of whose principal officer, the president and treasurer of PK, KM paid. So close and intimate was the relationship between KM and PK that KM approved a statement of that relationship, contained in PK's catalog and distributed to PK's dealers, headed in large letters "Kent-Moore Corporation . . . your new partner." Mr. Soderberg testified the statement prepared by him and approved by KM's president represented "my understanding of the relationship between Kent-Moore and PK at the time and I wanted this conveyed to the dealers." He further testified "we felt [it was] an essential thing to be said to make PK appear to be a viable company." In testifying about the early conversations with Mr. Adair, Jr., he said:

> I indicated . . . we are concerned about the financial, apparent financial status of Peter Kennedy. We wanted to be paid within 30 days of each of our billings and I told Mr. Adair that, and, again, he supported this whole line of discussion that they were there to provide money and management to make this thing go.

In substance what here appears, in effect, is a reasonably relied-upon continuing representation by KM, through its controlled personnel also working as PK employees, that plaintiff would be paid by and from KM's resources; that plaintiff could extend and continue to extend credit to PK and perform the services which KM, as well as PK, wanted performed. KM expected large benefits from those services. For purposes of upholding the judgment, not only is the doctrine of disregarding the corporate entity available— available also are principles of agency and estoppel.

■ ■ Defendant finally contends that RCW 19.36 .010(2), the statute of frauds, prevents plaintiff from recovering as a matter of law. Defendant argues that to permit recovery would be to permit recovery on a "special promise to answer for the debt, default, or misdoings of another person . . ." for which a writing, as described in the statute, is required. There are several answers to this contention. In the first place, this contention is made on

appeal for the first time in defendant's reply brief. CAROA 41(1) provides that "the appellant shall not be permitted to urge in any such reply brief  . . .  , or on the hearing, any grounds for reversal not clearly pointed out in his original brief." In the second place, although the defendant's answer raised the defense of the statute of frauds, thereafter neither in the pretrial stipulation of the parties which is incorporated in finding of fact No. 15 and which states the issues of law to be decided, nor in the trial briefs of the parties, is there any further reference to the defense now claimed. To permit the defense to be raised now when it appears to have been abandoned or, at any rate, not urged before the trial court, would not conform to appeal requirements. *See Stratton v. U.S. Bulk Carriers, Inc.,* 3 Wn. App. 790, 478 P.2d 253 (1970); *Puget Sound Marina, Inc. v. Jorgensen,* 3 Wn. App. 476, 475 P.2d 919 (1970). Finally, RCW 19.36.010(2) is inapplicable to an original undertaking, as distinguished from a "special promise to answer for the debt, default, or misdoings of another person  . . ." KM is being held liable on an original undertaking of its own arising from the conduct of its authorized and controlled personnel whose paramount loyalty was to KM.

Affirmed.

JAMES and CALLOW, JJ., concur.