[No. 7539-3-II.   Division Two.   March 25, 1986.]

BARRY THOMAS, *Respondent*, v. RUDDELL LEASE–
SALES, INC., *Appellant*.

*Robert L. McAdams,* for appellant.

*Kenneth D. Williams* and *Johnson & Williams,* for respondent.

REED, A.C.J.—Ruddell Lease–Sales, Inc., appeals a judgment for Barry Thomas rescinding a contract for the sale of a sports car. We affirm and remand for a recomputation of prejudgment interest.

On May 8, 1979, Thomas bought a used 1976 Corvette Stingray from Lease–Sales, a used car dealer in Port Angeles. During his first conversation with Lease–Sales, Thomas asked whether a wavy patch of paint meant that the car had been wrecked and repaired. The salesman, Len Wilson, who did not know, told Thomas that to the best of his knowledge the car had not been wrecked. Thomas testified that he was dissatisfied with the high price of nearly $10,000, but elected to purchase after Howard Ruddell told him that the price was higher than blue book because the car was in top condition. Ruddell, too, did not know whether the car had been in a collision, but acknowledged

at trial that he might have said the Corvette was in top condition.

The purchase order that Thomas read and signed contained a blanket disclaimer of warranties. As Thomas was reading the agreement, the salesman pointed out the following statement and requested that Thomas initial it: "I understand you don't provide any warranties whatsoever, and the auto is sold as is and with all defects. . . ." Wilson explained that this provision would protect Lease–Sales from complaints of engine problems from buyers who would punishingly drive a high–performance sports car like the Corvette. No other specifics were discussed. Thomas then initialed the disclaimer.

Thomas paid off the contract May 10, 1979. Within a week, Thomas noticed that the car vibrated severely in front, constantly drifted to the right, and would both "lope" at low speeds and "shimmy" at fast speeds. He complained to Lease–Sales, but the dealer was either unwilling or unable to correct these problems. Thomas continued to drive the car for 2 to 3 months between home and work. The car seemed to wear through its tires rapidly, and for this reason Thomas felt unsafe and garaged the car.

In February 1980 Thomas again began using the Corvette, which immediately broke down. A mechanic found that the fuel pump had ruptured because it was rubbing against the motor mount, a problem that he thought unusual in a car of fairly recent vintage. In making the necessary repairs, the mechanic found that the motor could not be reinstalled without mechanically prying the mount into alignment with the frame. He also observed that the frame had been welded conspicuously. He concluded that the frame had been bent and then repaired and that Thomas would continue to have engine problems and vibration because parts were misaligned.

Thomas immediately told Ruddell by telephone that he had been promised a car in top condition and that he

wanted his money back. Ruddell then had the car examined by a body repair specialist, who assured Thomas that the problems of wandering and excessive tire wear were attributable solely to a bent crosspiece, a problem to which he believed General Motors cars were susceptible and that could easily occur without a collision.

Ruddell offered to have the frame examined at a specialty frame shop, and on or about May 10, 1980, sent his salesman to Thomas's business in Forks with a loan car in order to bring the Corvette back to Port Angeles. However, Thomas refused to release the car for repairs unless the salesman signed a statement acknowledging that any repairs were the responsibility of Lease–Sales, that Thomas was rejecting his contract, that Thomas did not accept the Corvette as what he had been promised, and that Thomas was not waiving any legal rights against Lease–Sales. Ruddell refused to give the salesman permission to sign this statement, and the Corvette was left with Thomas.

Between February 1980 and February 1981, Thomas continued to try to use the car[1] but it was again garaged after February 1981. On June 30, 1981, Thomas brought this action for rescission of the contract, seeking refund of the purchase price, recoupment of his repair costs, an award of damages, attorney's fees, and a trebling of damages under the Consumer Protection Act. In preparation for trial, Thomas had a specialty frame shop examine the car. He was told that the frame had been cut open and repaired, affecting tire wear and general safety.

At trial, Lease–Sales's expert witness, Irwin Rohrich, a Seattle auto dealer specializing in Corvettes, testified that blue book prices for Corvettes were unreliable; that the car actually had been worth more than Thomas had paid for it in 1979, when he had paid a price above blue book. However, Rohrich conceded on cross examination that about 25

---

[1]No issue was raised by Ruddell Lease–Sales that Thomas had waived or was estopped from revoking his acceptance because of his extensive use of the car after becoming aware of the defects, nor that his revocation was not timely.

percent of his customers would not buy a Corvette if they knew that it had been wrecked. The mechanic who had examined the frame for Thomas testified that he would not buy a Corvette that had been repaired after a collision. He also testified that the defects in the Corvette would not have been apparent to a purchaser, because the fiber–glass exterior is remolded onto the chassis when extensive collision repair is performed.

The court granted Thomas rescission of the contract on September 30, 1983. The judgment was based on alternative grounds: (1) the parties had made a mutual mistake of fact about the subject matter of the contract; and (2) the prior collision affected the operability of the vehicle for Thomas's purposes, was a substantial and material nonconformance of the goods, and substantially impaired the value of the vehicle to Thomas. The court further found that the disclaimer had not been negotiated and was ineffective. The court ordered refund of the purchase price, plus interest of 10 percent per annum from the date of the sale, plus the cost of repairs and tire replacement. The court denied the Consumer Protection Act claims.

▮ Our review is limited to determining whether the trial court's findings are supported by substantial evidence, and, if so, whether the findings in turn support the conclusions of law. *Goodman v. Darden, Doman & Stafford Assocs.*, 100 Wn.2d 476, 483, 670 P.2d 648 (1983). We need determine only whether the evidence most favorable to the prevailing party supports the challenged findings, even if the evidence is in conflict. *North Pac. Plywood, Inc. v. Access Road Builders, Inc.*, 29 Wn. App. 228, 232, 628 P.2d 482, *review denied*, 96 Wn.2d 1002 (1981). Findings of fact supported by substantial evidence will not be reversed on appeal. *Funderburk v. Bechtel Power Corp.*, 103 Wn.2d 796, 799, 698 P.2d 556 (1985).

▮ First, we find no merit in the finding that a mutual mistake furnished grounds for rescission of contract. A party seeking to rescind must show by clear, cogent and convincing evidence that the mistake was independently

made by both parties, that is, by relying on independent sources or a common source of information. *Simonson v. Fendell,* 101 Wn.2d 88, 91–92, 675 P.2d 1218 (1984). There is no *mutual* mistake when, as here, one party relies on the other for mistaken information. *Simonson,* 101 Wn.2d at 91–92; *Pepper v. Evanson,* 70 Wn.2d 309, 313–14, 422 P.2d 817 (1967).

Nevertheless, we find that Thomas fully carried his burden of proving his entitlement under the Uniform Commercial Code to revoke his acceptance of the Corvette and cancel his contract with Lease–Sales. Revocation of acceptance is justified only if: the goods accepted have a nonconformity that substantially impairs their value to the buyer, and, if the buyer accepted without knowledge of the nonconformity, the acceptance was reasonably induced either by the difficulty of discovery of the nonconformity before acceptance or by the seller's assurances. RCW 62A.2–608(1). The burden is on the buyer to establish any breach of contract or warranty with respect to the goods accepted, RCW 62A.2–607(4). If the buyer justifiably revokes acceptance, he may cancel the contract and recover the price paid. RCW 62A.2–711(1).

Thomas asserts that the Corvette failed to satisfy the warranty of merchantability that is implied in all goods sold by a merchant dealing in goods of that kind. RCW 62A.2–314(1). However, Thomas's proof of the nonconformity of the Corvette to that warranty must fail unless it can be shown that the disclaimer that he signed was ineffective.

■ A disclaimer or waiver is ineffective unless (1) it is explicitly negotiated between the buyer and the seller, and (2) it sets forth with particularity the qualities and characteristics that are not being warranted. *Berg v. Stromme,* 79 Wn.2d 184, 196, 484 P.2d 380 (1971). Furthermore, in the case of consumer transactions occurring on and after July 24, 1974, the second of these tests has been codified:

[I]n any case where goods are purchased primarily for personal, family or household use and not for commercial

or business use, disclaimers of the warranty of merchantability or fitness for particular purpose shall not be effective to limit the liability of merchant sellers except insofar as the disclaimer sets forth with particularity the qualities and characteristics which are not being warranted.

RCW 62A.2–316(4) (codifying Laws of 1974, 1st Ex. Sess., ch. 78, § 4, p. 167, effective July 24, 1974). This codification has left unchanged the first requirement of *Berg v. Stromme,* that the disclaimer be negotiated. *Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.,* 28 Wn. App. 539, 542 n.5, 625 P.2d 171 (1981).

The record fully supports the trial court's finding that Lease–Sales neither negotiated the disclaimer of warranty nor informed Thomas correctly as to the qualities and characteristics intended to be excluded by the disclaimer. On the contrary, he was told that the disclaimer referred only to engine wear that might occur through his misuse of the vehicle. The trial court did not err in concluding that the disclaimer was ineffectual.

Substantial evidence also supports the court's conclusion that the Corvette was not merchantable. To be merchantable goods must at least be such as pass without objection in the trade under the contract description, and fit for the ordinary purposes for which such goods are used, RCW 62A.2–314(2)(a), (c). The evidence demonstrates that a significant segment of the buying public objects to buying a Corvette that has been damaged and repaired. Therefore, a wrecked and repaired Corvette does not pass *without objection* in the trade as a "used Corvette."

■ In the case of a used car, the warranty of merchantability insures that the car is in reasonably safe condition and substantially free of defects that render it inoperable. *Testo v. Russ Dunmire Oldsmobile, Inc.,* 16 Wn. App. 39, 43, 554 P.2d 349, 83 A.L.R.3d 680 (1976). Here, there was substantial evidence—Thomas's testimony—that this Corvette did not provide safe transportation. The trial court was entitled to believe Thomas. *Anderson v. Frandsen,* 36

Wn. App. 353, 355, 674 P.2d 208 (1984). Further, there was credible testimony that even an adequate repair would leave the frame weak. Therefore, as respects the vehicle's operating and safety qualities also, the finding of a nonconformity premised on breach of warranty is fully supported by substantial evidence.

■ There was also substantial evidence that this nonconformity substantially impaired the value of the Corvette. The question of substantial impairment of value is a factual one and must be determined with reference to the objective needs and expectations of the buyer, not on the latter's unarticulated subjective desires. *Hays Merchandise, Inc. v. Dewey,* 78 Wn.2d 343, 347, 474 P.2d 270 (1970); *Blake v. Federal Way Cycle Ctr.,* 40 Wn. App. 302, 306, 698 P.2d 578, *review denied,* 104 Wn.2d 1005 (1985).

The trial court had before it Thomas's testimony about his mechanical problems with the Corvette. Thomas tried to use the car for daily transportation in 1979; during 1979 he repeatedly sought repairs of the annoying and dangerous lesser defects; when the car became dangerous in his eyes, he garaged it; and when it suffered a major mechanical breakdown because of its structural defects he paid for extensive repairs himself, and then demanded a refund. The value to Thomas of having a safe vehicle for simple transportation was "substantially impaired" by the car's nonconformity to its warranty of merchantability. The finding of substantial impairment is amply supported by substantial objective evidence.

■ Lease–Sales argues that, even if Thomas was entitled to revoke his acceptance and cancel his contract, the trial court erred in its measure of damages. Lease–Sales assigns error to the court's failure to award damages based upon evidence of cost of cure. However, Lease–Sales fails to support that assignment of error by argument or citation of authority, and we decline to consider it. RAP 10.3(a)(5); *Orwick v. Seattle,* 103 Wn.2d 249, 256, 692 P.2d 793 (1984). Similarly, Lease–Sales assigns error to the court's award of the cost of repairs and the depreciated cost of tires that

Thomas had installed when the car's defects caused its tires to degrade quickly. However, Lease–Sales similarly fails to argue or cite authority for such an assignment, and we similarly decline to consider it.

Lease–Sales also assigns error to the refusal of the trial court to reduce Thomas's judgment in an amount representing the fair rental value of the car for the period from May 8, 1979, to June 1, 1980. Lease–Sales is correct in arguing that, usually, upon rescission by a buyer, the seller of the goods is entitled to fair rental value in order to restore him to the position he was in before the transaction. *J.I. Case Credit Corp. v. Stark,* 64 Wn.2d 470, 480, 392 P.2d 215 (1964). However, Lease–Sales introduced no testimony or evidence in support of its requested fair rental value of $20 per day. A conclusion that it was entitled to offset the judgment by any particular amount would therefore have been entirely unsupported by evidence, and the trial court did not err in refusing to make it.

█ The trial court did, however, err in awarding prejudgment interest at 10 percent from the date of the sale. Lease–Sales correctly concedes that an award of prejudgment interest from the date of the sale was proper, because the purchase price, to which Thomas was entitled upon justified cancellation of the contract, was liquidated as of that date. *See Silverdale Hotel Assocs. v. Lomas & Nettleton Co.,* 36 Wn. App. 762, 772, 677 P.2d 773, *review denied,* 101 Wn.2d 1021 (1984); *Vermette v. Andersen,* 16 Wn. App. 466, 472, 558 P.2d 258 (1976). Before July 26, 1981, RCW 19.52.010, governing prejudgment interest, provided for a rate of 6 percent per annum. Effective July 26, 1981, the rate was increased to 12 percent per annum. Laws of 1981, ch. 80, § 1, p. 346. The trial court, in awarding judgment on September 30, 1983, back to the date of purchase, May 8, 1979, should have awarded interest at the 6 percent statutory rate that prevailed between May 8, 1979, and July 26, 1981, and at the 12 percent rate that became effective on July 26, 1981, until the entry of judgment. *See Boardman v. Dorsett,* 38 Wn. App. 338, 342–43, 685 P.2d 615,

*review denied,* 103 Wn.2d 1006 (1984).

We therefore affirm the judgment of the trial court, with the exception of its award of prejudgment interest. We remand for redetermination of prejudgment interest as indicated herein.

PETRICH and ALEXANDER, JJ., concur.