# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Parenting and Support of: | No. 60498-1-II |
| B.E.C., child. | |
| JUSTINE ANN BECKER, | |
| Appellant, | |
| And | |
| MATTHEW ROBERT COLE, | UNPUBLISHED OPINION |
| Respondent. | |

CRUSER, C.J.—Justine Becker appeals the trial court's parenting plan, arguing that (1) the trial court's finding of abusive use of conflict was not supported by substantial evidence, (2) the trial court erred by applying a presumption for equal residential custody, (3) the trial court erred by applying the "friendly parent" doctrine, and (4) the trial court improperly weighed the statutory factors found in RCW 26.09.187(3)[1] in determining the residential provisions of the parenting plan. Cole responds that the trial court neither abused its discretion nor committed errors of law in crafting the parenting plan. Cole further contends that this court should sanction Becker for improper citations of unpublished opinions as authority.

---

[1] RCW 26.09.187 was amended in 2025. Because these amendments do not affect our analysis, we cite to the current version of the statute. LAWS OF 2025, ch. 166, § 4.

We hold that the trial court did not abuse its discretion in determining that Becker had engaged in abusive use of conflict and in weighing the child's best interests, and committed no errors of law. Accordingly, we affirm. We also award attorney fees to Cole and impose a sanction against Becker's counsel.

FACTS

I. BACKGROUND

Justine Becker and Matthew Cole share a three-year-old son, BEC. Cole is a flight attendant based in Boise, Idaho, while Becker lives in Eatonville, Washington. They would travel between Idaho and Washington to visit each other and their extended families for brief stays. The flight duration from SeaTac to the Boise airport is approximately one hour.

Cole was present for BEC's birth and testified that he was as involved in Becker's pregnancy as he could be, attending every prenatal appointment. Cole testified that he was a hands-on parent during BEC's infancy, performing parental duties like changing diapers, feeding, and staying up to take care of BEC at night. Cole would regularly FaceTime (a video call platform) Becker to talk to BEC. Cole attended most of BEC's medical appointments and performed parental functions whenever BEC was with him. BEC stayed with Cole in Idaho alone on three separate occasions before court involvement.

Becker and Cole sought a temporary parenting plan for BEC, which the trial court entered. Because Cole had recently been charged with DUI, the plan provided that Cole was required to undergo a chemical dependency evaluation and it further required him to provide the results of the evaluation to Becker.

2

Throughout the pendency of the temporary orders in this case, Becker frequently interfered with Cole's ability to communicate with BEC. Between September 13 and 28, 2022, Cole sent 10 requests to Becker via OurFamilyWizard (OFW) to FaceTime BEC while BEC was in Becker's custody. Becker did not respond to these requests. However, Becker responded relatively frequently and quickly to Cole's OFW messages concerning other matters.

Becker denied most of Cole's requests to FaceTime with BEC in October 2022. Becker told Cole to "stop sending messages" for FaceTime calls, accused Cole of harassment, and threatened to obtain a no-contact order against him if he continued to request to talk to BEC. Ex. 102 at 111. Becker said "I will send you a message letting you know when [BEC] will Facetime." *Id.* at 48. At no point throughout all of their OFW messages did Becker initiate a message saying that Cole could FaceTime with BEC when it wasn't a response to Cole's request.

October 30, 2022, Cole asked to FaceTime with BEC and to see BEC's Halloween costume. Becker told Cole that BEC may not be available and "[y]ou have not asked what [BEC] is being for Halloween." *Id.* at 87. Cole replied, "What is [BEC] going to be for Halloween?" *Id.* at 88. Becker did not respond.

On Halloween, Cole twice requested to FaceTime BEC for the holiday. Becker finally allowed a two-minute FaceTime call to show BEC trick-or-treating, although BEC did not know that Cole was on FaceTime. After Halloween, Cole asked Becker to send him pictures of BEC in his costume. Becker refused because the photos of BEC included Becker's other child in them. Cole instructed Becker how to erase or crop Becker's daughter out of pictures on her phone so that she could send him a photo of BEC. Becker refused to edit the photo or share it with Cole.

The next day, Becker again refused Cole's request to FaceTime with BEC, responding only that the temporary order states " 'FaceTime to occur at Ms. Becker's discretion.' " *Id.* at 91. A couple of days later, Cole stated that it has been three-and-a-half weeks since he was able to FaceTime BEC. Becker said, "That's a lie, you faced [sic] [BEC] on Monday 10/31" and that she will be following the temporary orders, which direct: " 'FaceTime to occur a [sic] Ms. Becker discretion.' " *Id.* at 96, 97. On November 4, 2022, Becker again responded to a FaceTime request from Cole by saying "[BEC] is unavailable." *Id.* at 101

This behavior abated in January 2023 when it appeared that Cole and Becker rekindled their relationship. During that time, Cole even gifted Becker a promise ring. According to Cole, however, Becker's behavior would change depending on whether a court proceeding or court monitoring was approaching. In February 2023, Becker sent an email to Cole's employer alleging that Cole was violating policy by doing supervised visits at the Alaska store at the airport that Cole had access to. The email included a copy of the temporary parenting plan at the time, Cole's sealed personal health records of substance use assessment, obtained through this parenting proceeding, a report from a private investigator that Becker hired to investigate Cole containing his personal information and court history (including dockets), and screenshots of voicemail notifications from Cole on January 24, 2023. Becker also accused Cole of working under the influence on January 24, 2023, and said she was "concerned [Cole] would retaliate if I provided additional information." Ex. 105 at 2. Becker disseminated this information without Cole's permission and without notifying the trial court. Afterwards, their relationship again soured. The temporary parenting plan directed a schedule that Cole may have FaceTime calls with BEC every Sunday, Tuesday,

4

Thursday, or otherwise agreed upon day. Despite that, Becker's pattern of ignoring and impeding Cole's requests for FaceTime resumed. This pattern continued on OFW until trial.

Becker's communications with Cole displayed a similar pattern by impeding Cole's visitation with BEC. Becker's family members contributed to these difficulties during visitation transfers. Becker's brother, for example, yelled out of his car and honked his horn at Cole because Cole was five minutes late to a visitation exchange with BEC. During another exchange, Becker's father dropped BEC's blanket onto Cole, in front of BEC, and left without saying a word. Both Becker's brother and father live on the same property as Becker. The trial court ultimately found Becker in contempt based on these and several other instances of Becker or her designated supervisors refusing to cooperate with visitation provisions. Following the contempt finding against Becker, the communications between Becker and Cole continued to be acrimonious.

On one occasion Becker refused to engage in conversation with Cole during a transfer, stating only that "[a]ll communication is to be done via OFW per the temporary orders." Ex. 102 at 235. However, Becker and Cole routinely would communicate outside OFW through texts, and occasionally via phone.

On another occasion, Cole messaged Becker asking how he could reimburse her for his half of BEC's medical expenses because she has him blocked on Venmo. The amount that Cole owed was $0.48. In response, Becker only replied that Cole's percentage for non-covered medical expenses was 54% and that he owed her reimbursement. When Cole again tried to ascertain how he could reimburse Becker, her only reply was "[p]lease reach out to my lawyer." Ex. 102 at 247. Becker then asked Cole to pay her the $0.48 via check. Cole did not own a checkbook and had not

written a check before and said that there are other viable options for repayment. Becker refused and told Cole to reach out to her lawyer.

## II. TRIAL

At trial, Cole testified consistently with the above facts.

The trial court made a finding that Cole has a history of alcohol abuse, but did not find that his substance abuse, which was in remission, affected his ability to parent. The trial court found that Cole has attended Alcoholics Anonymous meetings and maintained his sobriety since the entry of the first temporary parenting plan. The parenting plan contains a limitation that Cole may not use alcohol during any residential time with BEC.

The trial court determined that Becker engaged in abusive use of conflict. In support of its finding, the trial court cited several actions by Becker, including Becker's refusal to open OFW messages when Cole was requesting FaceTime, Becker's failure to provide supervisors on multiple occasions, and Becker's contribution to the continuing difficulties in communication between the parties which created a "constant back and forth" when one text could resolve the issue. Verbatim Rep. of Proc. (VRP) at 863. The trial court determined that Becker engaged in "a lot of games" throughout the text messages and that they were "exhausting." *Id.* at 862. The trial court highlighted an instance where Becker cancelled a visitation while Cole was in transit although he had communicated that he would be late due to mechanical malfunctions. The trial court also referenced Becker ignoring Cole's FaceTime requests, refusing to accommodate Cole's request for a Halloween photo of BEC, accusing Cole of harassment for wanting to talk to BEC, refusing to provide Cole with a way to reimburse her for $0.48, and Becker's demand that all conversations only occur through OFW but then texting outside of the platform to support its finding. The trial

court further supported its finding by referencing the custody exchange with Becker's father, and its prior finding of contempt against Becker in exhibit 128. Finally, the trial court pointed to Becker's email sharing Cole's criminal history, alcohol evaluation, and Cole's voicemails to Becker with Cole's employer as the most egregious example of Becker's abusive use of conflict. Because Cole provides airline benefits for Becker and BEC through his employment, interference with Cole's employment could limit the location Cole could exercise his visitations with BEC and make equal residential custody more difficult. The trial court concluded this was a "textbook" case of abusive use of conflict. *Id.* at 861.

### III. PARENTING PLAN

The trial court examined the statutory factors in RCW 26.09.187 and former RCW 26.09.191 (2021) and determined that it was in BEC's best interests to enter a permanent parenting plan that gave both parents equal residential time with BEC on a week-on/week-off schedule while BEC is younger than school age. Once BEC reaches school age, he will spend his residential time primarily with Cole. Becker will have residential time with BEC on the second and fourth weekend of each month. Becker appeals, arguing that (1) the trial court's finding of abusive use of conflict was not supported by substantial evidence, (2) the trial court erred by applying a presumption for equal residential custody, (3) the trial court erred by applying the "friendly parent" doctrine, and (4) the trial court improperly weighed the statutory factors found in RCW 26.09.187(3) Br. of Appellant at 3.

DISCUSSION

I. STANDARD OF REVIEW

We review a trial court's ruling regarding the placement of children for abuse of discretion. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). A trial court abuses its discretion when its decision is "manifestly unreasonable or based on untenable grounds or untenable reasons." *Id*. We review factual findings for substantial evidence. *Id.* "Substantial evidence is that which is sufficient to persuade a fair-minded person of the truth of the matter asserted." *Id*. So long as substantial evidence supports a finding, it is immaterial that other evidence may contradict the finding. *In re Marriage of Burrill*, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). We do not review the trial court's credibility determinations or weigh the evidence. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). We treat unchallenged findings of fact as verities on appeal. *In re Guardianship of T.H.*, 15 Wn, App. 2d 495, 501, 475 P.3d 1045 (2020).

Appellate courts are reluctant to disturb a trial court's decision on the residential placement of a child because of the trial court's unique opportunity to personally observe the parties. *In re Marriage of Murray*, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981). The broad discretion of the trial court in ordering a permanent parenting plan must be exercised according to the guidelines set forth in RCW 26.09.187(3). *In re Marriage of Littlefield*, 133 Wn.2d 39, 52, 940 P.2d 1362 (1997). This section must be read in conjunction with RCW 26.09.002 (policy of the Parenting Act of 1987), RCW 26.09.184 (objectives and requirements of the permanent parenting plan), and RCW 26.09.191 (setting forth limiting factors requiring or permitting restrictions on a parent's involvement with the child). *Id.*

Where the record indicates substantial evidence was presented on the statutory factors set forth in RCW 26.09.187, making them available for consideration by the trial court, specific enumerated findings are not required on each factor. *In re Marriage of Croley*, 91 Wn.2d 288, 292, 588 P.2d 738 (1978). When written findings of fact do not clearly reflect a consideration of the statutory factors, we can consider the trial court's oral ruling. *Murray*, 28 Wn. App. at 189.

## II. ABUSIVE USE OF CONFLICT

Becker argues that the trial court's finding of abusive use of conflict was not supported by substantial evidence because the finding relies both on actions that could not affect the psychological development of BEC, and upon the actions of others. Cole responds that the trial court appropriately considered past behavior in finding that Becker engaged in abusive use of conflict and that its finding was supported by substantial evidence. We agree with Cole.

*A. Legal Principles*

"The trial court has discretion to determine whether the evidence presented meets the requirements of RCW 26.09.191." *In re Parenting and Support of L.H.*, 198 Wn. App. 190, 194, 391 P.3d 490 (2016). We will affirm the trial court's findings of fact when they are supported by substantial evidence. *In re Marriage of Jacobson*, 90 Wn. App. 738, 743, 954 P.2d 297 (1998).

A court may limit a parent's residential time with a child if the parent has engaged in the abusive use of conflict which creates "danger of serious damage to the child's psychological development." Former RCW 26.09.191(3)(e). Imposing restrictions pursuant to former RCW 26.09.191(3) " 'require[s] more than the normal . . . hardships which predictably result from a dissolution of marriage.' " *Katare*, 175 Wn.2d at 36 (alteration in original) (quoting *Littlefield*, 133 Wn.2d at 55). However, a trial court's finding that a danger of serious damage exists does not

require evidence that actual harm already occurred before imposing restrictions. *Id.* Determining "whether to impose restrictions based on a threat of future harm necessarily involves consideration of the parties' past actions." *Id.* at 39. "RCW 26.09.191(3) obligates a trial court to consider whether '[a] parent's involvement or conduct *may* have an adverse effect.' " *Id.* (quoting former RCW 26.09.191(3)). "To make this determination, the trial court must engage in a form of risk assessment." *Id.*

Evidence that a parent's conduct severely impairs their child's relationship with the child's other parent can constitute sufficient evidence from which a trial court can find a danger of serious psychological damage to a child. *Burrill*, 113 Wn. App. at 872. In *Burrill*, we held that evidence showing that a parent "strenuously opposed any contact [between the child and their other parent], supervised or otherwise, despite the fact that they were well bonded with [the parent]," can constitute substantial evidence that a parent's conduct creates a danger of serious psychological damage to the child. *Id.*

### B. Application

Becker first complains that the trial court erroneously relied on past acts in finding that she engaged in abusive use of conflict, citing *In re Marriage of Nordby*, 41 Wn. App. 531, 534, 705 P.2d 277 (1985). Becker relies on *Nordby's* statement that "[t]he test for fitness of custody should be the present condition of [a parent] and not any future or past conduct." *Nordby*, 41 Wn. App. at 534. However, Becker ignores that this statement from *Nordby* was superseded by the legislature in RCW 26.09.187(3)(a)(iii), which directs the trial court to consider "[e]ach parent's *past and potential for future performance* of parenting functions as defined in RCW 26.09.004(2), including whether a parent has taken greater responsibility for performing parenting functions relating to the

daily needs of the child." (Emphasis added.) Furthermore, determining whether to impose restrictions based on a danger of future harm necessarily considers a parties' past actions. *Katare*, 175 Wn.2d at 39. The trial court did not err in relying on past acts.

Second, Becker argues that substantial evidence does not support the trial court's finding of abusive use of conflict because she and Cole experienced intermittent reconciliations during their tumultuous relationship, rendering some of the acts relied on by the trial court "stale." But the fact that some of the acts preceded or straddled short lived reconciliations does not undercut the trial court's finding. Becker's behaviors during times of tumult are certainly relevant to the trial court's overall consideration of abusive use of conflict.

Third, Becker argues that the trial court's findings could not amount to an abusive use of conflict because the trial court could not rely on evidence that did not directly affect BEC. Becker argues that the trial court could not consider her refusal to provide a method of repayment of $0.48, communicating with Cole outside of OFW, and calling Cole's employer to share his criminal history and accuse him of alcoholism because these actions could not have an impact on BEC's own psychological development. But this conduct could pose a danger to BEC's psychological development by significantly exacerbating the conflict between Becker and Cole. Becker's refusal to communicate with Cole over OFW and her insistence that Cole communicate with her through her attorney similarly exacerbated the conflict between the parties with costly consequences for BEC's psychological development.

Moreover, a breakdown in communication between BEC's parents could have significant consequences for BEC's physical well-being if his parents do not communicate which caretaking responsibilities have already been completed between transfers. Becker's email to Cole's employer

risked Cole's airline benefits which Becker and BEC used to carry out the residential provisions of the parenting plan. In light of Becker's consistent efforts to prevent Cole from communicating with or visiting BEC, it appears that she shared this information with Cole's employer in order to further limit Cole's ability to visit with BEC. The trial court did not err in relying on this evidence.

Fourth, Becker contends that the trial court impermissibly based its finding of abusive use of conflict upon the conduct of others, rather than Becker's own conduct. Specifically, Becker contends that the trial court could not rely on its finding that she did " '[n]ot make[ ] supervisors available on multiple occasions' " to support its finding of abusive use of conflict because Becker could not force supervisors to be available and the terms of the parenting plan in effect at the time provided that Cole should pay for professional supervisors in the event that the identified supervisors were unavailable. Br. of Appellant at 14 (quoting VRP at 861). But the record established that Becker frequently responded to Cole's requests for visitation by saying that all of her supervisors were unavailable. When Cole attempted to come up with alternate supervisors, because he was unable to afford professional supervisors, Becker would deny them without explanation. Whether Becker refused to have supervisors available to force Cole to miss visits or whether Becker's supervisors were genuinely unavailable is a credibility determination that is within the trial court's purview to make. We do not review the trial court's credibility determinations or reweigh the evidence. *Black*, 188 Wn.2d at 127.

Relatedly, Becker further complains that the trial court could not rely on the video of Becker's father dropping a blanket onto Cole during a custody exchange because Becker's father's conduct could not be deemed abusive use of conduct by Becker. Given that Becker's father lived

on the same property as Becker and was also a visitation supervisor, the trial court did not err in considering this incident as part of Becker's overall inability to co-parent with Cole.

Finally, Becker argues that the trial court impermissibly relied on a finding that Becker refused to respond to a text message from Cole asking what BEC was for Halloween because that finding was contradicted by the evidence. Becker contends that the messages in the record were incomplete as evidenced by the fact that in later communications Cole knew what costume BEC wore, so the trial court incorrectly relied on her failure to respond to Cole's message. The trial court referred to this exchange as an example of how Becker abused communication with Cole. In particular, Becker texted Cole and remarked that Cole did not ask what BEC was going to dress as for Halloween. The remark was plainly critical and intended to provoke a response. Then, when Cole responded by asking what BEC was going to be for Halloween, Becker did not respond. This evidence supports the trial court's finding of abusive use of conflict.

Becker nonetheless points to circumstantial evidence indicating that Cole knew the following day what BEC dressed as, but this argument entirely misses the point. The trial court's concern was about Becker's *behavior*, not whether Cole ultimately learned what costume BEC wore for Halloween. While the trial court acknowledged that the exhibits were incomplete, it ultimately relied on Cole's testimony on this matter. "We need determine only whether the evidence most favorable to the prevailing party supports the challenged findings, even if the evidence is in conflict." *Thomas v. Ruddell Lease-Sales, Inc.*, 43 Wn. App. 208, 212, 716 P.2d 911 (1986). Moreover, even if Becker had responded to this particular message, substantial evidence supports the conclusion that Becker consistently sought to prevent Cole from communicating and

visiting with BEC. Thus, even excluding the Halloween exchange from consideration, substantial evidence in the record supported the trial court's finding of abusive use of conflict.

III. APPLICATION OF PRESUMPTION IN FAVOR OF EQUAL RESIDENTIAL CUSTODY

Becker argues that the trial court abused its discretion by applying a presumption in favor of equal residential placement. Additionally, Becker contends that the trial court should apply a " 'strong presumption in favor of custodial continuity' " in her favor. Br. of Appellant at 19 (quoting *In re Marriage of Stern*, 57 Wn. App. 707, 712, 789 P.2d 807 (1990)). Cole argues that the trial court did not apply a presumption of equal residential placement but rather based its parenting plan on the best interests of the child. Cole further argues that there is no presumption in favor of the primary caregiver for a permanent parenting plan. We conclude that the trial court did not abuse its discretion because it did not apply a presumption in favor of equal residential custody, and the trial court did not err by declining to apply a presumption in Becker's favor based on "custodial continuity."

*A. Legal Principles*

This case involves the initial permanent placement decision governed by RCW 26.09.187(3). It does not involve a modification of custody placement, which would be governed by RCW 26.09.260. *In re Marriage of Kovacs*, 121 Wn.2d 795, 802 n.13, 854 P.2d 629 (1993). "In entering a permanent parenting plan, the court shall not draw any presumptions from the provisions of the temporary parenting plan." Former RCW 26.09.191(5).

Parents are encouraged to work together to develop a parenting plan including residential placement under RCW 26.09.184. *Jacobson*, 90 Wn. App. at 743. "[I]n the absence of agreement, the trial court is given that responsibility." *Id.*

The Washington Parenting Act of 1987, ch. 26.09 RCW, does not create a presumption in favor of placement with the primary caregiver. *Kovacs*, 121 Wn.2d at 800. In determining the permanent residential placement, the Act guides the trial court to consider seven factors, placing the greatest weight on the strength, nature, and stability of the child's relationship to each parent. RCW 26.09.187(3)(a). The trial court may also "consider the parties geographic proximity to the extent necessary to ensure the ability to share performance of the parenting functions" in considering the best interests of the child. RCW 26.09.187(3)(b). It is within the trial court's discretion to include residential provisions which "may contain any reasonable terms or conditions that facilitate the orderly and meaningful exercise of residential time by a parent." RCW 26.09.187(3)(c).

*B. Application*

Becker argues that the trial court abused its discretion by applying a presumption in favor of equal residential placement presumably because the residential provisions entail a relatively equally shared residential schedule until BEC starts kindergarten. However, nowhere in the record does the trial court mention applying such a presumption. Instead, it carefully considers all seven statutory factors in its oral ruling. The trial court determined that a residential schedule where BEC spends alternating weeks with each parent while he is under school age was in the best interests of BEC because BEC had a thriving relationship with both parents, both parents could perform their parental functions, and BEC has close connections with his family members on both sides and both provide him with many activities.

Becker next contends that even if the trial court did not apply a "presumption" of equal placement, the parenting plan nevertheless was not in BEC's best interest because it failed to take

into account the " 'strong presumption in favor of custodial continuity against modification' " of parenting plans. Br. of Appellant at 19 (quoting *Stern*, 57 Wn. App. at 712). Becker quotes *Stern*, ignoring that *Stern* involved a *modification* of a parenting plan rather than the initial entry of a permanent parenting plan. *Stern*, 57 Wn. App. at 708-09. Becker cites no apposite authority for this alleged "presumption" in the context of a permanent parenting plan. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

The trial court did not apply an impermissible presumption in favor of equal residential placement and did not abuse its discretion in creating the residential provisions of the parenting plan.

## IV. APPLICATION OF "FRIENDLY PARENT" DOCTRINE

Becker argues that the trial court abused its discretion by applying the "friendly parent" doctrine. Cole responds that the trial court did not abuse its discretion because the trial court did not indicate anywhere in its ruling that it was applying the friendly parent doctrine but instead, expressly considered every statutory factor in determining the residential provisions of the parenting plan. We agree with Cole.

*A. Legal Principles*

"[R]esidential provisions may contain any reasonable terms or conditions that facilitate the orderly and meaningful exercise of residential time by a parent." RCW 26.09.187(3)(c). The "friendly parent" concept is when "primary residential placement is awarded to the parent most likely to foster the child's relationship with the other parent." *In re Marriage of Lawrence*, 105

Wn. App. 683, 687, 20 P.3d 972 (2001). In Washington, use of the "friendly parent" concept to determine residential placement is improper and rejected. *Id.* This is reflected in Washington's policy that "custody and visitation privileges are not to be used to penalize or reward parents for their conduct." *In re Marriage of Cabalquinto*, 100 Wn.2d 325, 329, 669 P.2d 886 (1983); *Lawrence*, 105 Wn. App. at 687-88. It is an abuse of discretion for a trial court to rely on the "friendly parent" doctrine. *Lawrence*, 105 Wn. App. at 688. However, the trial court may include within the residential provisions "any reasonable terms or conditions that facilitate the orderly and meaningful exercise of residential time by a parent." RCW 26.09.187(3)(c).

*B. Application*

Becker argues that the trial court applied the friendly parent doctrine. This is so, Becker contends, because the trial court considered " 'each parent's willingness to work with the other parent to facilitate the travel and implement what is certain to be a very parent-involved Parenting Plan' " in determining what residential arrangement was in BEC's best interests once he reaches kindergarten. Br. of Appellant at 20 (emphasis omitted) (quoting VRP at 867). However, this oral remark by the trial court does not reflect an intention to either penalize or reward either parent for their conduct, and Becker points us to no finding of fact or conclusion of law reflecting such an intent. The trial court's remark merely reflects its belief that the plan, which requires BEC to travel between states frequently, both before and after he attains school age, can only work if "each parent" cooperates. Additionally, the trial court's oral ruling mimics the language found in the objectives of a parenting plan. RCW 26.09.184(1)(f); RCW 26.09.187. The trial court did not apply the "friendly parent" doctrine and did not abuse its discretion when it awarded primary residential placement to Cole once BEC reaches school age.

V. RCW 26.09.187(3)(a) FACTORS

Becker argues the trial court abused its discretion in making the residential provisions of the parenting plan because it ignored evidence that assigning Cole primary residential custody is not in the best interests of BEC. Cole responds that the trial court did not abuse its discretion because substantial evidence supported the trial court's factual findings and those findings support the trial court's conclusion that the parenting plan was in the best interests of the child. We hold that the trial court did not abuse its discretion in making the residential provisions because the trial court carefully weighed the statutory factors in light of its factual findings and concluded that it was in BEC's best interests to award Cole primary residential custody once BEC attains school age.

*A. Legal Principles*

The standard by which the court determines and allocates the parties' parental responsibilities is what is in the child's best interests. RCW 26.09.002. This policy for drafting a permanent parenting plan must be read in conjunction with the objectives of a permanent parenting plan in RCW 26.09.184(1) and guidelines for residential provisions in RCW 26.09.187(3)(a). *Kovacs*, 121 Wn.2d at 803-04.

> [T]he best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities. The state recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and that the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests.

RCW 26.09.002.

The objectives of a permanent parenting plan must consider the best interests of the child. RCW 26.09.184(1); *see* RCW 26.09.002. The best interests of the child are determined using the

statutory criteria set forth in RCW 26.09.187. Restrictions may be placed on the parenting plan for conduct that may have an adverse effect on the child's best interests. Former RCW 26.09.191(3). A parenting plan must include a residential schedule. *Littlefield*, 133 Wn.2d at 51; RCW 26.09.184(6). The residential schedule must be consistent with the child's best interests and any restrictions imposed. RCW 26.09.184(6).

A trial court may preclude or limit any provisions of the parenting plan if a parent's involvement or conduct may have an adverse effect on the child's best interests through the factors enumerated in former RCW 26.09.191(3). *Littlefield*, 133 Wn.2d at 54. Where the limitations of RCW 26.09.191 are not dispositive with regard to the child's residential schedule, the court shall consider (i) "[t]he relative strength, nature, and stability of the child's relationship with each parent;" (ii) any "agreements of the parties;" (iii) "[e]ach parent's past and potential for future performance of parenting functions," "including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;" (iv) "emotional needs and developmental level of the child;" (v) child's relationship with significant adults as well as involvement with physical surroundings or other significant activities; (vi) wishes of the parents; (vii) "[e]ach parent's employment schedule." RCW 26.09.187(3)(a)(i)-(vii).

A parenting plan must provide for "residential provisions . . . which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances." RCW 26.09.187(3)(a). Factor (i) is to be given the greatest weight amongst the enumerated factors to consider in drafting a residential schedule. *Id.* However, factor (i) is not alone dispositive. *See Jacobson*, 90 Wn. App.

at 745. The trial court should consider all the statutory factors in developing a residential schedule in the best interests of the child. *Id.*

"Where the limitations of RCW 26.09.191 [ ] are not dispositive, the court may order that a child frequently alternate [their] residence between the households of the parents for brief and substantially equal intervals of time if such provision is in the best interests of the child." RCW 26.09.187(3)(b). For example, a schedule dividing residential time by four nights and three nights a week may be upheld if it is in the child's best interests. *Jacobson*, 90 Wn. App. at 746. The trial court may also consider "geographic proximity to the extent necessary to ensure the ability to share performance of the parenting functions." RCW 26.09.187(3)(b).

*B. Application*

Becker first argues that the trial court abused its discretion in making the residential provisions of the parenting plan because the trial court's findings under RCW 26.09.187 were inadequate and did not support the residential provisions. Becker argues that the trial court fails to fully and adequately address the relative strength, nature, and stability of BEC's relationships because it ruled equally in favor of both parents. But RCW 26.09.187 does not require that each factor only weigh in favor of a single parent. Indeed, Washington courts have sometimes concluded that factor (i) weighs equally in favor of both parents. *See Jacobson*, 90 Wn. App. at 745-46.

Next, Becker argues that the trial court failed to account for the fact that Becker was BEC's "primary attachment figure" in weighing the relative strength, nature, and stability of BEC's relationships. Br. of Appellant at 22. But there is no presumption in favor of the primary caregiver. *Kovacs*, 121 Wn.2d at 807. Becker contends that a primary attachment figure is different from a

primary caregiver, asserting that Becker spent more time performing parenting functions for BEC than Cole did. But the trial court, after considering all of the evidence, stated its view that Cole is as involved in parenting functions as he can be, is responsible for parental functions when BEC is with him, and it had no concerns about Cole's ability to perform the parental functions in the future. We will not second guess the trial court's weighing of evidence and credibility determinations. *Black*, 188 Wn.2d at 127. Although Becker claims that the trial court ignored significant evidence that it was not in BEC's best interests to have to equal residential time with Cole, the evidence in the record substantially supports the trial court's determination that BEC would benefit from continued contact with both of his loving and capable parents.

Becker also claims that the trial court failed to fully consider factor (i) because it did not consider Cole's prior DUIs. This assertion is belied by the record, however, because the trial court implemented restrictions on Cole based on his history with alcohol abuse in its RCW 26.09.191 findings.

Finally, Becker contends that the trial court's findings pertaining to each parents' past and potential for future performance of parenting functions,[2] were insufficient to "flip[ ] custody" from Becker to Cole. Br. of Appellant at 25. But in entering a permanent parenting plan, the court shall not draw any presumptions from the provisions of the temporary parenting plan. Former RCW 26.09.191(5). There was no "custody" previously established to be able to "flip custody." The trial court determined that once BEC reaches school age, it would be in his best interest to reside primarily with Cole and there were no concerns about either parent's ability to perform parental functions in the future. This finding is supported by substantial evidence in the record. Because

---

[2] *See* RCW 26.09.187(3)(a)(iii).

the trial court found that each parent was well-bonded to BEC and could adequately perform parental functions, and because it found that it was in BEC's best interest to assign primary residential placement with Cole once BEC reaches school age, the trial court did not abuse its discretion in assigning Cole primary residential custody once BEC enters school.

The trial court did not abuse its discretion in determining the residential provisions of the parenting plan. The trial court properly weighed each statutory factor to create a parenting plan in the best interests of the child. Each finding was supported by substantial evidence in the record.

## VI. IMPROPER CITATIONS TO UNPUBLISHED OPINIONS

Cole requests that Becker's counsel be sanctioned for violating GR 14.1(a) by citing to unpublished opinions as authority without identifying the opinion as unpublished. Becker's counsel argues that these violations are harmless and that sanctions would be inappropriate because the violations can be remedied. We hold that Becker repeatedly violated GR 14.1 and that a sanction is warranted.

### A. Legal Principles

Citation to unpublished opinions in a party's brief is governed by GR 14.1. An appellate court may order counsel who fails to comply with the Rules of Appellate Procedure to pay sanctions to the court. RAP 18.9(a). Citations to unpublished opinions within a party's brief should conform to GR 14.1. RAP 10.4(h). "[U]npublished opinions of the Court of Appeals filed on or after March 1, 2013, may be cited as nonbinding authorities," if the citing party identifies it as such. GR 14.1(a). However, GR 14.1(a) prohibits citing unpublished Washington court of appeals opinions as authority. *In re Marriage of Schnurman*, 178 Wn. App. 634, 645, 316 P.3d 514 (2013).

An appellate court may address a violation of GR 14.1(a) by striking the cases cited and their attached arguments from consideration. *Condon v. Condon*, 177 Wn.2d 150, 166, 298 P.3d 86 (2013). Appellate courts have also imposed monetary sanctions for violations of GR 14.1(a). *Schnurman*, 178 Wn. App. at 645 (imposing a $100 sanction against counsel, payable to the court registry).

*B. Application*

Cole requests sanctions pursuant to RAP 18.9(a) because Becker's counsel cited to two unpublished opinions without identifying the opinions as unpublished in violation of GR 14.1(a). We agree that Becker's counsel violated GR 14.1(a) twice by neglecting to identify cited authority as unpublished. Becker's counsel responds that these omissions were harmless as they were made alongside authority. Becker's counsel's first violation occurred when she cited "*Matter of Parenting and Support of AW*, Wash: Court of Appeals, 2nd Div. 2020" for her contention that the trial court erred in finding of abusive use of conflict based on former RCW 26.09.191(3)(e). Br. of Appellant at 13. Becker's counsel argues that we should overlook this violation because the improperly cited authority simply reiterates the statutory language quoted previously. Becker's counsel's second violation occurred when she cited "*In re Matter of Marriage of Keane*, Wash: Court of Appeals, 1st Div. 2010" for her argument that there is a "strong presumption in favor of custodial continuity and against modification" in custody changes. Br. of Appellant at 19. Becker's counsel argues that this improper citation was harmless and not worthy of sanctions because it was listed secondary to a published opinion, *Stern*, 57 Wn. App. at 712, that stood for the same proposition of law.

Becker's counsel further argues that sanctions are inappropriate because RAP 18.9(a) only pertains to the Rules of Appellate Procedure, and the rule governing the citation of unpublished opinions is found in the General Rules. This argument is absurd, and ignores that RAP 10.4(h) directly references GR 14.1. Finally, counsel argues that GR 14.1(a) requires only that a party identify that the opinion is unpublished, but does not specify when such an identification must occur. Accordingly, Becker's counsel contends, they can remedy a failure to identify an authority as unpublished in the opening brief by identifying it as such in the reply brief. Becker's counsel cites no authority in support of this argument. Where, as here, "no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." *DeHeer*, 60 Wn.2d at 126.

Becker's counsel plainly violated GR 14.1(a) and we hold that monetary sanctions against counsel are warranted in an amount to be determined by a commissioner of this court.

## ATTORNEY FEES

Both parties request attorney fees under RCW 26.09.140 as the prevailing party. A party may request attorney fees if applicable law grants them the right to recover the fees. RAP 18.1(a). Upon any appeal under RCW 26.09.140, "the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." An award of attorney fees under RCW 26.09.140 is based on a consideration of " 'the parties' relative ability to pay' and 'the arguable merit of the issues raised on appeal.' " *In re Marriage of Muhammad*, 153 Wn.2d 795, 807, 108 P.3d 779 (2005) (quoting *In re Marriage of Leslie*, 90 Wn. App. 796, 807, 954 P.2d 330 (1998)).

Cole is the prevailing party on appeal, and we award him attorney fees in an amount to be determined by a commissioner of this court

Becker also requests need-based fees and costs under RCW 26.09.140. Where a court must consider financial resources in determining an award of attorney fees, each party must serve, at least 10 days before oral argument, financial affidavits regarding need and ability to pay. RAP 18.1(c); *In re Marriage of Coons*, 53 Wn. App. 721, 722-23, 770 P.2d 653 (1989). Cole filed the required financial affidavit as required by RAP 18.1(c), but Becker did not. "An appellate court will not consider an award of attorney fees on appeal under RAP 18.1 and RCW 26.09.140 when a party seeking fees fails to comply with RAP 18.1(c)." *In re Marriage of Crosetto*, 82 Wn. App. 545, 565-66, 918 P.2d 954 (1996)). We deny Becker's request for fees and costs.

CONCLUSION

We affirm the trial court, award attorney fees to Cole, and deny Becker's request for fees and costs. We further sanction Becker's counsel for violations of GR 14.1.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

LEE, J.

PRICE, J.